**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | **CRIMINAL NO. 19-133 (DRD)** |
| v. | |
| **GILBERTO J. HERNÁNDEZ-MARÍN,** | |
| *Defendant.* | |

**OPINION AND ORDER**

On July 12, 2021, a jury found Defendant, Gilberto J. Hernández-Marín guilty of one-count for the possession of a machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). Pending before the Court are Hernández-Marín's *Renewed Motion for Judgment of Acquittal* (Docket No. 131) and *Motion for New Trial* (Docket No. 146). The Government filed *Responses in Opposition* thereto. *See* Docket Nos. 139 and 151. For the reasons set forth below, the Defendant's *Motion for Judgment of Acquittal and Motion for New Trial* (Docket Nos. 131 and 146) are hereby **DENIED**.

**I.     RELEVANT FACTUAL BACKGROUND**

On February 21, 2019, a Grand Jury returned a One-Count *Indictment* against the Defendant for the possession of a machinegun, that is, a 7.62 caliber rifle, Zastava Serbia, model PAPM92P, bearing serial number M92PV017054, that had been modified so that it was capable of firing automatically more than one shot, without manual reloading, by a single function of the trigger, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). *See* Docket No. 9. The charge was the result of a traffic stop intervention which took place on February 16, 2019.

**Puerto Rico Police Department's Traffic Stop and Intervention with Hernández-Marín**

In accordance with the testimonies heard by the Jury, Agent Greg Cruz-Figueroa was patrolling in his assigned K-9 patrol car in the Municipality of Trujillo Alto on or around 10:00 p.m. when he received a telephone call from Sergeant Quiñones. As a result thereof, Agent Cruz proceeded to arrive at the Sergeant's location, namely, Ciudad Universitario Shopping Center located at Route 846. *See Transcript of Proceedings – Jury Trial, Day 1*, Docket No. 143 pp. 28-30.

Upon arriving at a Total Service Station in said grounds, he observed a parked Dodge RAM pickup truck with its lights on. *See id.*, p. 32. As soon as the vehicle started moving towards the gasoline dispatch pumps, Sergeant Quiñones turned on the blue lights and siren of the patrol and intervened with Hernández. *See id.*, p. 34. Thereafter, Agent Cruz also turned on his patrol lights and proceeded to approach Sergeant Quiñones' location. *See id.* As the car's windows were dark, Agent Cruz performed an intervention because of the use of illegal tinted glass. *See id.*, p. 39. According to Agent Cruz, when the Defendant lowered the window, he could see the driver and its interior. *See id.* He then asked the Defendant for his driver's license and registration. *See id.*, p. 40. While he was looking for the documents, Agent Cruz went to his patrol car to get the photometer. *See id.*, p. 42. He then proceeded to ask the Defendant to raise the windows and open the door so he could place the device. *See id.* According to Agent Cruz, Hernández-Marín opened the door and he proceeded to perform the photometer test. *See id.*, p. 43. The car doors were opened to perform the photometer test instead of requiring Hernández-Marín to lower the car windows because of the height of the vehicle and in order to properly place both parts of the photometer, to wit, transmitter, and receiver, on the glass. *See Transcript of Jury Trial – Day 2*, Docket No. 37, p. 37. He then informed the Defendant that the light transmission according to the machine was 20

percent when a light transmission cannot be below 35 percent by law. *See Transcript of Jury Trial – Day 1*, Docket No. 143, p. 43. Therefore, the Defendant was informed that he would perform a full inspection of the vehicle. *See id.*, p. 44.

As Agent Cruz asked Hernández-Marín to open the back door, he placed the photometer in said door and suddenly noticed what "could be the butt of a firearm." *See id.*, p. 45. He notified Sergeant Quiñones and asked the Defendant whether he had a permit to possess firearms, to which he answered in the affirmative. Agent Cruz then noticed the butt of a firearm underneath the driver's seat. Both firearms where in close proximity to each other. *See id.*, p. 46. Thereupon, Agent Cruz notified Sergeant Quiñones of the existence of another firearm, and upon verifying Hernández-Marín's license permit, it was only a permit for target shooting. According to Agent Cruz, that meant that "under the law, the only way that the weapons can be transported is being concealed inside their case, and they have to be separate from the ammunition. And in order to be transported, they can only be transported from the home to the firing range, and from the firing range to the home." *Id.*, p. 47. Therefore, the firearms were being transported "in an improper manner." *Id.* Hernández-Marín was then asked to step out of the vehicle, he was read his warnings and placed under arrest. *See id.*, p. 48. The butts of the firearms where not retrieved from the vehicle until confirmation as to ownership was obtained from the REAL system at the general police headquarters. *See id.*, pp. 48-49. Agent Cruz then proceeded to call "Servicios Técnicos" (hereinafter, "Technical Services") "[b]ecause there were two weapons [he] was observing; two firearms that were loaded inside a vehicle." *Id.*, p. 50.

Pursuant to the information provided by the Puerto Rico Police Department (hereinafter, "PRPD") one of the firearms, an AK-47 appeared to have been altered. *See id.,* p. 51. Upon arrival, Technical Services took photographs of where the firearms were located, to wit, underneath the

driver's seat and on the floorboard of the passenger seat in the back of the pickup truck. *See id.* The AK-47 which was retrieved by Agent Cruz is a MP92 Zastava, caliber 7.62 x 39, serial number, PV0107054. *See id.*, p. 56. According to Agent Cruz, the firearm "was all black. It had its magazine in. It was loaded, and it had a particularity that it had -- the lower receiver was welded." *Id.* Therefore, the firearm was capable of firing automatically without having to trigger it. *See id.*, p. 57. It was accordingly, "relatively visible" the fact that the firearm was altered. *See id.*, p. 58. It was then removed from the site in order to be unloaded. *See id.* The firearm had 30 rounds in the magazine and one in the chamber, known as the barrel. It, therefore, had a total of 31 rounds. *See id.*, p. 91.  A second firearm was retrieved, to wit, a black with a silver barrel Taurus G2 model with serial number TLT10456. *See id.* Said firearm seemed normal and had 15 rounds of 9mm caliber according to Agent Cruz. *See id.*

The jury was shown photos of the scene, the firearms, and the ammunitions, which were described in detail by Agent Cruz. *See* Government Exhibit Nos. 1-40.

## Knowing Possession of a Machinegun

The Government called Agent William Lugo-Rodríguez, a Puerto Rico Police Officer assigned to the Weapons Regulation and Permit Issuance Division, as a witness. *See Transcript of Jury Trial – Day 2*, Docket No. 144, p. 39. Mr. Lugo works with the REAL system, wherein weapons, weapons permits, and ammunitions sold in Puerto Rico are registered. *See id.* The jury was shown Hernández-Marín's citizen profile, wherein the registered firearms that belong to the Defendant were reflected. *See id.*, pp. 40-41. The report showed that Hernández-Marín had a target shooting permit which was cancelled. *See id.* The weapons that appear registered include a Glock, model 23, caliber .40, serial number PKG188; an Aero Precision pistol, model X15, caliber .223 and 5.56, which is considered a small rifle; and the Taurus pistol, PT111, caliber 9mm, with serial

number TLP10485, which is one of the weapons that was found during the intervention subject of the case at bar. *See id.*, pp. 42-45. All weapons were seized as a result of an investigation. *See id.*, p. 59. According to Agent Lugo, the seized Aero Precision X15 pistol has several calibers, to wit, .224 Valkyrie, .300, .22, .223, .22LR, .300 AAC Blackout, 5.56 x 45, 5.56, 6.8, 9mm, and 7.62 x 39. *See id.*

The jury was also shown Hernández-Marín's Ammunition Purchase Report from January 2, 2017 through June 29, 2021. *See id.*, p. 46; *see also* Government's Exhibit 43. According to the report, through that timespan, Hernández-Marín purchased 500 ammunitions of .223 caliber; 700 ammunitions of .40 caliber; 220 ammunitions of 7.62 x 39 caliber and 2,150 ammunitions of 9mm caliber. *See id.*, p. 47. The report reflects that the Defendant made two transactions for rounds of 7.62 x 39 caliber at MB Gun Club, an armory, on December 31, 2018 and January 17, 2019. *See id.*, p. 49.

Finally, Agent Lugo confirmed that there was a negative report as to the Zastava pistol occupied as part of the Defendant's car intervention. Therefore, that firearm is not registered legally to anyone. *See id.*, p. 51; *see also*, Government's Exhibit 42.

The Government also called Mayra Ramírez, owner of MB Gun Club, as a witness. Ramírez testified that armories must keep a registry of 20 years of gun purchases as required by state law. *See id.*, p. 62. She also explained that in order for a person to buy ammunitions, you can walk into an armory and buy it as long as you have a permit. *See id.*, p. 63. The buyer must also have a "registered caliber" which according to Ramírez means that "to be able to sell, for example, a 9mm ammunition, you have to have bought a gun through the process in a gun store. You are to have it registered under your name, on your license, and we can access your profile that PRPD will give us access, and I would be only able to sell to you the ammunition that you have

registered." *Transcript of Jury Trial – Day 2,* Docket No. 144, p. 63. Hence, all armories have access to the REAL system. *See id.*, p. 64. The jury was shown searches made by Ramírez (Government's Exhibits 44, 45, 46), while explaining that the system needs to have a record of all the ammunition that is being sold. *See id.*, p. 65. According to Ramírez, "[e]verything has to be registered and no ammunition can leave the gun store if it's not registered." *Id.*, p. 65. The record will register the date and time of purchase and at the end of the document, both the armorer and the buyer have to agree that the purchase was proper. *See id.*, p. 66. Thereupon, the local Government retains the original document. *See id.*

Ramírez then confirmed that Hernández-Marín purchased 100 rounds of 7.62 x 39 ammunition on January 17, 2019 at 1:28 p.m. and 34 seconds at the MB Gun Club. *See* Government's Exhibit 44-44A. In order for the Defendant to make the purchase, the armorer needs to log into the system with the buyer's weapons permit and then the armorer enters her pin number, and the Defendant must equally enter a pin number which allows the armorer to see whether he is registered to the REAL system. *See id.*, p. 67. Upon pulling his name up, the system provides a photo of the registered buyer and upon identifying the buyer and entering the pin, the armorer is able to access the calibers the person has registered. *See id.*, p. 68-69. All sales go to the PRPD. *See id.*, p. 68. Ramírez also confirmed the purchase made on December 31, 2018. *See* Government's Exhibit 45.

The Government showed Ramírez the bag of ammunitions, which were identified as Tulammo 7.62 x 39, the only 7.62 ammunitions that her armory sells at least since 2019. *See id.*, p. 70-71; *see also* Government's Exhibit 38. The armorer further testified that if a person comes in and owns an Aero Precision X15 model, she can sell them rounds of 7.62 as "you can fire 7.62, .300 Blackout." *Id.*, p. 74. Accordingly, she was shown a stripped Aero Precision X15, namely, a

X15 stripped lower receiver, serial number X180770, which Ramírez testified cannot be fired unless the lower part is placed. However, you can buy ammunition with a stripped lower receiver pursuant to Puerto Rico law. *See id.*, p. 74-75; *see also* Government's Exhibit 118.

The Government then called Agent José Fajardo-Vega as a witness. He is a police officer at the Carolina Police Precinct who has worked with the Ammunitions Task Force (hereinafter, "ATF") for the past 14 years. *See id.*, p. 79. He was contacted by Sergeant Quiñones as they had seized the Defendant's firearm which was considered a machine gun. *See id.*, p. 80. Accordingly, Agent Fajardo seized other weapons and ammunitions from the Defendant. *See id.*, p. 82. The Government then showed and authenticated photos of all the weapons and ammunitions seized from the Defendant. *See id.*, p. 82; Government's Exhibits 49, 119 and 120. According to the pictures, 48 rounds of 7.62 caliber ammunitions were occupied by the ATF. *See* Government's Exhibit 120.

Mr. Ricardo Diaz-Torres was also called as a witness. He works for the Department of the San Juan Municipal Police, particularly detailed with the Department of National Security. *See Transcript of Jury Trial – Day 3*, Docket No. 145, p. 3. Mr. Diaz is assigned to the forensics laboratory where he analyzes digital evidence in cases where there is a criminal investigation. *See id.*, p. 4. Accordingly, the Government showed the witness the Defendant's iPhone with which he worked with at the laboratory. *See* Government's Exhibit 116. As the iPhone was blocked, Mr. Diaz was only able to partially extract information from the device. *See id.* p. 6. Once the information was extracted, he made an image with the forensic software, and opened said image with another software in order to be able to see its contents. *See id*; Government Exhibits 59-108. The images related thereto were authenticated by the witness. The Government showed the witness

images that were extracted from the Defendant's iPhone, such as an internet searches of parts of a rifle. *See id.*, p. 8; Government Exhibit 100.

Ultimately, Ms. Eve Eisenbise was called as an expert witness in firearms and ammunition for the Government. She works for the ATF in the Firearms and Ammunition Technology Division. *See Transcript of Jury Trial -Day 3*, Docket No. 145, p. 13. According to Ms. Eisenbise, she tested the firearm that was submitted, namely, the Zastava PAP M92. *See id.*, p. 17. She made a report dated March 19, 2019 where she found that "the firearm, classifies as a firearm under the GCA [Gun Control Act] as well as it classifies as a machine gun, which is a firearm under both GCA and NFA [National Firearm Association]." *See id.*, p. 18. According to Ms. Eisenbise,

> [u]pon examining the firearm, [she] noted that it is a Zastava PAP M92, which is an AK-type firearm system, and it is made in Serbia by Zastava, and it is imported into the United States and marketed by a company called CAI or Century Arms in Georgia, Vermont. The firearm was originally manufactured as a semiautomatic pistol. In other words, it did not have a shouldering device or a stock on it. It was made as a pistol version in a semiautomatic Zastava.

> [She] also noted several modifications immediately, just noted by looking at the external part of the firearm, and [she] also upon further examination of the inside of the firearm, [] noted other modifications made to the firearm that converted it into a machine gun. So the firearm classified not only as a firearm because it will expel a projectile by the action of an explosive and incorporated the receiver of the firearm, but it is also a machine gun because it is capable of expelling more than one projectile with a single function of the trigger, and it incorporated the receiver of a machine gun.

*Id.*, pp. 18-19; Government's Exhibit 37. The Government showed the Zastava firearm to the witness, and she proceeded to explain her findings to the jury in detail. She explained to the jury that the portion in the back of the firearm that runs forward of the pistol grip is the receiver, which constitutes the firearm. It is the most serialized part of a firearm as "in and of itself without anything on it is a firearm because it's the main receiver of the firearm." *Id.*, p. 21.

One of the first things stated by Ms. Eisenbise was that she noticed upon examining the firearm was the modifications. Although it is manufactured as a semiautomatic pistol, she "noticed on the outside of the firearm, in a location where an automatic sear pin would go on an AK machine gun, . . . there is machining in the way of a hole that runs through both sides of the receiver, and in that hole, a pin has been installed. This is the automatic sear pin. It holds in the automatic sear assembly on a machine gun." *Id.,* p. 21. Ms. Eisenbise further noticed there is some swaging of the material or scratches around the pin. "[T]here is a nice finish on this firearm -- is scratched up during the installation, indicating . . . that this was done aftermarket. The manufacturer did not make it this way. And you can see this pin on both sides." *Id.* The expert also noticed another hole just forward of the auto sear pin hole that does nothing. According to Ms. Eisenbise, it was likely drilled in the wrong place as it does not serve any purpose. Therefore, it is a modification that is not there. *See id.*, pp. 21-22.

Ms. Eisenbise further noticed that below the selector, the lever that you push from top to bottom to move it from safe to fully automatic or to semiautomatic, there is another small modification, namely, "[t]here appears to be a small bit of a metallic weld or metal installed there, and it's in the correct location to hold or accommodate the selector in the center position, which is the position for automatic fire. These modifications are very obvious from the outside, and they are not the way the firearm was manufactured." *Id.*, p. 22. She then proceeded to define the concept of a machine gun for the jury's reference as

> a weapon which will expel more than one projectile by the action of an explosive without manual reloading by a single function of the trigger. So a machine gun is a weapon which will shoot more than one bullet with a single pull of a trigger. Also, a machine gun is the frame or receiver of any such weapon. So the definition also includes the frame or the receiver of a machine gun.

*Id.* Another finding of Ms. Eisenbise was that the firearm usually comes with a wood forend handguard like you would see on a traditional AK-type firearm. Instead, the Zastava has an aftermarket handguard installed, and an accessory at the bottom, called hand stop. *See id.*, p. 23. Ms. Eisenbise explained that "the hand stop is like many accessories on a firearm; it is an accessory that's meant to give a particular tactical advantage. It's meant to hold your hand in place when you are firing a machine gun that is short like this." *Id.*, p. 23. Since the accessory does not have a stock, if a user shoots automatically, it serves to keep the hand from potentially slipping out in front of a very short, potentially, ten-inch barrel. *See id.* According to the expert, "[o]nce the hole for that pin was machined through this receiver, it became a machine gun. That is a manufacturing process, the drilling of this hole, and that is the step, that is the step that takes this – in the manufacturing process, that's the step that crosses the line and makes this into a machine gun receiver, is just drilling the hole. You have made a machine gun, okay, because it is the receiver of a machine gun." *Id.*, p. 24. Ms. Eisenbise further added that even if we take off all the parts of the firearm and just have receiver, it is still a machine gun because it has the auto sear pin hole. That is the element that makes it a machine gun receiver. *See id.*

It is critical to note that as part of the firearm testing, Ms. Eisenbise fired the weapon by putting one round in the magazine of the JSP Barnaul ammunition, namely, a 7.62 x 39 caliber. *See id.* According to the expert, it is a very common caliber for an AK-type system. She was able to confirm that the firearm was capable of firing automatically by performing the following test:

> [She] put one round in the magazine, and with the selector lever in the semiautomatic position, [she] squeezed the trigger, and the exhibit expelled the projectile by the action of an explosive. In other words, it fired the round.
>
> [She] then took the same magazine, same ammunition, and loaded two rounds of ammunition into the exhibit, and with the selector in the first position for automatic fire, [she] pull[ed] the trigger, and the exhibit expelled both projectiles by a single pull of the trigger.

> [She] then loaded five rounds of the same ammunition into the magazine, put it into the exhibit, and with the selector level in the automatic position, squeezed the trigger. <u>It expelled all five rounds by a single pull of the trigger. So it functions as a machine gun. It shoot automatically and it incorporated the receiver of the machine gun.</u>

*Id.*, pp. 24-25. Mr. Eisenbise emphasized that just by the receiver having a hole for the automatic sear pin it makes it a receiver of a machine gun. *See id.*, p. 25.

The Government then proceeded to post questions as to the insides of the firearm. The expert explained and showed the jury that the "inside the receiver, it has the automatic sear assembly installed. It also has a machine gun triggering hammer installed. And there is a modification on the inside, . . . on the bolt guide rails where a notch is cut, and it's been machined away to accommodate the automatic sear. So it has the machine gun parts in it." *Id.*, p. 27. According to Ms. Eisenbise, an automatic sear is what allows a firearm to fire automatically as well as the hammer and disconnecter pieces which have been changed in a machine gun. *See id.*, p. 28. The firearm also presented a bolt guide rail, which is consistent with modifications made after leaving a factory. *See id.*

Ms. Eisenbise further testified that the weapon had been fired before she received it. Specifically, "[m]any of [her] pictures note the fouling, grayish-carbon fouling. Those pictures are all taken prior to [] firing eight rounds through it. So it had definitively been fired." *Id.*, p. 28. She then showed the jury the grayish residue she was referring to. According to the expert, "the bolt and the piston, they have a lot of fouling, indicating that it's been fired quite a bit before." *Id.*, p. 29. Photographs of the firearm before the testing were also submitted as evidence.

As to the ammunition, she identified that the Zastava firearm shoots 7.62 x 39 caliber ammunition. *See id.*, p. 30. According to the expert, "[m]any firearms use this caliber, but it is the most -- it would be the most common caliber for AK-type firearms." *Id.*, p. 30. The Government

also posted questions about the Aero Precision X15 pistol and its capability to use 7.62 x 39 caliber ammunition. However, upon questions regarding an AR-type firearm receiver, the expert emphasized that it is the receiver portion of a firearm, which is typically associated with .223 Rem or 5.56 NATO. *See id.*, p. 32. Nonetheless, AR firearms can be barreled with a barrel and a chamber for other calibers, but to build an AR that fires 7.62 x 39 is more rare. *See id.*, pp. 33-34. It is important to note that Ms. Eisenbise clarified that in order to modify the firearm,

> you would need a basic, basic knowledge of assembly, disassembly. You wouldn't have to necessarily be a gunsmith, but you would have to have some knowledge as to how to take this gun apart, put it together. And as far as where to drill the hole, this is not hard to do on this firearm. You would need to go online and get the measurements as to where to place that hole."

*Id.*, p. 43. According to Ms. Eisenbise, information as to converting a weapon, such as a Zastava into a machine gun is available through the internet. There are many sources "that will show you how to convert both of these types of firearms, also how to build them and assemble them, how to take them apart and take care of them, how to convert them to a machine gun, what parts you will need, where to drill the hole, the measurements." *Id.*, p. 46.

On a separate note, the expert testified that the parts which make the firearms into machine guns are readily available online. The parts are not expensive, namely, between $50.00 and $100.00. Ultimately, the auto sear assemblies are not controlled and can be purchased online. *See id.*, pp. 46-47.[1]

## II.     RELEVANT PROCEDURAL BACKGROUND

On July 12, 2021, at the close of the United States' case in chief, Defendant orally moved for a judgment of acquittal on the count pending against him. *See, e.g.*, Docket No. 126.

---

[1] The Court notes that the only person called as a witness by the Defendant was his sister, Yanidselle Hernández-Marín. As her testimony is unrelated to the controversy related to the knowing possession of the firearm, the Court deems irrelevant to discuss it further. *See Transcript of Proceedings – Jury Trial, Day 3*, Docket No. 145, pp. 59-76.

Hernández-Marín essentially argued that charges pursuant to 18 U.S.C. 922(o) require a knowing possession. The Defendant further argues that the Government failed to set forth the elements required by law in order to demonstrate said possession. It is further argued that the Government failed to prove that the Defendant knew that the weapon was a machine gun. Therefore, the Government has failed to meet the burden required for the charge against Hernández Marín. *See Transcript of Jury Trial Proceedings, Day 3,* Docket No. 145, pp. 50-52.

On July 25, 2021, after being found guilty of the count charged, the Defendant supplemented his oral motion in writing. *See* Docket No. 131. Hernández-Marín essentially rehashed the arguments raised and used case law to buttress his position that the Government failed to meet the burden required for charges for possession of a machinegun pursuant to 18 U.S.C. 922(o).

On August 2, 2021 the United States filed its response to Defendant's motion for acquittal. *See* Docket No. 139. The Government argued that the jury heard testimony as to the police intervention with Hernández-Marín, which resulted in finding a loaded Zastava firearm with visible modifications to its exterior in the back of the vehicle, which upon further testing turned out to have been modified to fire automatically.  *See* Docket No. 139 at 1-2. Moreover, the Government pointed towards the Defendant's purchase of ammunition compatible with the machinegun shortly before his arrest. *See id.* Finally, the Government argues that the jury saw photos from Hernández-Marín's "phone saved from his web browsing that suggested he had shopped online for gun parts." *Id.*, p. 2.

On August 25, 2021, the Defendant filed a *Motion for New Trial* seeking a new trial pursuant to Fed. R. Crim. P. 33 based in the best interest of justice. *See* Docket No. 146 at 2. Essentially, Hernández-Marín argues that the evidence is insufficient to sustain a conviction.

Therefore, "[a] district court's power to order a new trial pursuant to Rule 33 is broader than its power to grant a motion for acquittal." *Id.*, p. 2.

On October 12, 2021, the Government filed a *Response in Opposition* thereto. *See* Docket No. 151. The Government dismissed the Defendant's arguments by incorporating the arguments made in the motion in opposition to the Defendant's request for acquittal while arguing that the interests of justice do not require a new trial in the case at bar. *See id.*

## II.     LEGAL STANDARD

### A.     *Motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure*

Federal R. Crim. P. 29 provides that the Court, upon defendant's request and after the close of the government's case, must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction. "The [trial] tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. Hernandez*, 146 F.3d 30, 32 (1st Cir. 1998)(citing *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994)).

In analyzing a Rule 29 motion, "[v]iewing the evidence in the light most flattering to the jury's guilty verdict, [the Court must] assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008). Thus, "Rule 29 requires that a deciding court defer credibility determinations to the jury." *Hernández*, 146 F.3d at 32 (citing O'Brien, 14 F.3d at 706); *United States v. Walker*, 665 F.3d 212, 224 (1st Cir. 2011) ("we take the facts and all reasonable inferences therefrom in the light most agreeable to the jury's verdict."). Additionally, the Court "must be satisfied that 'the

guilty verdict finds support in a plausible rendition of the record.'" *United States v. Pelletier*, 666 F.3d 1, 12 (1st Cir. 2011)(quoting *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir. 2006)).

This standard is a "formidable" one, especially as "[t]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." *United States v. Loder*, 23 F.3d 586, 589-90 (1st Cir. 1994)(internal quotation marks omitted). Moreover, there is no "special premium on direct evidence." *O'Brien*, 14 F.3d at 706. "[T]he prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two." Id. (citing *United States v. Echevarri*, 982 F.2d 675, 677 (1st Cir. 1993)). Expressed in alternate fashion, "no premium is placed on direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992). As to evidentiary conflicts, "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995); *see Hernández*, 146 F.3d at 32 (the trial court is required to "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.")(citing *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997)). On the other hand, "[t]he court must reject only those evidentiary interpretations that are unreasonable, unsupportable, or only speculative and must uphold any verdict that is supported by a plausible rendition of the record." *United States v. Ofray Campos*, 534 F.3d 1, 31-32 (1st Cir. 2008); *see also United States v. Cruz Laureano*, 404 F.3d 470, 480 (1st Cir. 2005) (urging the trial court "not to believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record.")(citing *United States v. Gómez*,

255 F.3d 31, 35 (1st Cir. 2001)). Nevertheless, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." *United States v. De La Cruz Paulino*, 61 F.3d 986, 999 n.11 (1st Cir. 1995).

**B.**    ***Motion for New Trial under Rule 33 of the Federal Rules of Criminal Procedure***

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). A new trial is not warranted if the court is "satisfied that competent, satisfactory and sufficient evidence in th[e] record supports the jury's finding that this defendant is guilty beyond a reasonable doubt[.]" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992). "In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account," and there "must be a real concern that an innocent person may have been convicted" before the "interest of justice" requires a new trial. Id. The ultimate test in adjudicating a Rule 33 motion to vacate "is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir.2006) (internal citation and quotation omitted)).

The Court may grant a new trial if the jury's "verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Chambers*, 642 F.3d 588 (7th Cir.2011); *see U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir.1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."). Restated, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.' " *U.S. v. Swan*, 486 F.3d 260, 266 (7th

Cir.2007) (quoting *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir.1989)). "[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *U.S. v. Kuzniar*, 881 F.2d 466, 470 (7th Cir.1989), overruled on other grounds, 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005); *see United States v. Munoz*, 605 F.3d 359, 373 (6th Cir.2010)("it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred.")(internal citations omitted).

In the final assessment, a "district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a 'judgment call.' " *United States v. Connolly*, 504 F.3d 206, 211 (1st Cir.2007) (quoting *United States v. Maldonado–Rivera*, 489 F.3d 60, 65 (1st Cir.2007)). "[A]t least where the trial judge revisits the case to pass upon the new trial motion—an appreciable measure of respect [from the Circuit Court] is due to the 'presider's sense of the ebb and flow of the recently concluded trial.' " *Id.* (quoting *United States v. Natanel*, 938 F.2d 302, 313 (1st Cir.1991)); *see United States v. Falu–Gonzalez*, 205 F.3d 436, 443 (1st Cir.2000) ("We give considerable deference to the district court's broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes "new" evidence.") (internal quotation omitted). In considering the weight of the evidence for purposes of adjudicating a motion for new trial, a district judge "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir.2007) (citation omitted).  Yet, in reviewing such a request for a new trial, the Court remains ever mindful that "[t]he remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result." *United States v. Conley*, 249 F.3d 38, 45 (1st

Cir.2001); *see U.S. v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.").

### III.    LEGAL ANALYSIS

Defendant takes issue with the sufficiency of the evidence presented by the Government as to the count charged in the indictment. The Court must consider all facts in light most favorable to the prosecution and make all reasonable inferences in the Government's favor. *United States v. Garcia-Carrasquillo*, 483 F.3d 124, 129-30 (1st Cir. 2007); *United States v. Boulerice*, 325 F.3d 75, 79 (1st Cir. 2003); *United States v. Walters*, 904, F.2d 765, 770 (1st Cir. 1990); *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir. 1989). The Court will uphold a guilty verdict if "a rational factfinder could conclude that the prosecution proved all elements of the crime beyond a reasonable doubt." *See Garcia-Carrasquillo*, 483 F.3d at 129-30. During its inquiry, the Court shall "neither weigh the credibility of the witnesses nor attempt to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Munoz-Franco*, 487 F.3d 25, 41 (1st Cir. 2007) (internal citations and quotations omitted).

The jury found the Defendant guilty of one count for violating 18 U.S.C. §§ 922(o) and 924(a)(2). A conviction for possession of a machine gun requires proof of the *mens rea* element that the Defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machine gun." *Staples v. United States*, 511 U.S. 600, 602 (1994). Therefore, "if the defendant knew he possessed a rifle, but did not know that it would fire multiple rounds with a single pull of the trigger, he could not be convicted of knowingly possessing an unregistered machinegun. He might have knowingly possessed a rifle, which was in fact a machine gun; but he could not knowingly possess a machine gun unless he knew that it had the features (i.e., the capacity to fire multiple rounds with a single trigger pull) that makes owning it potentially

illegal." Docket No. 131 at 6. The Defendant posits that the Government has failed to present evidence upon which a reasonable juror could find beyond a reasonable doubt that the Defendant knew the firearm in his possession was modified to shoot automatically. *See id.*, p. 7. To wit, no evidence was presented as to who performed the modifications to the firearm, and no fingerprint analysis was performed on the firearm "to determine whether any fingerprints alluded to the fact that defendant had performed the modifications." *Id.* And ultimately, the Government failed to present a witness who saw or heard the Defendant firing the firearm. *See id.*

The Defendant seeks acquittal or, in the alternative, a new trial, under the premise that the Government failed to comply with the *mens rea* element of knowledge that the weapon the Defendant possessed had the characteristics within the statutory definition of a machine gun. To find the Defendant guilty, the Court instructed the jury that it must find that [f]irst, the defendant knowingly possessed the machinegun described in the indictment; and second, the defendant had knowledge of the characteristics that made the weapon a machinegun." Docket No. 129 at 18. The Court specifically instructed the jury that "[t]he word 'knowingly' means that the act was done voluntarily and intentionally, not because of mistake or accident. But the defendant need not have known that the weapon was considered a machinegun under federal law." *Id.* Defendant's position is grounded upon his interpretation of the statute of possession of an unregistered machinegun pursuant to *Staples*, 511 U.S. at 602, and the fact that although a *mens rea* element was not expressly included in the statute, it was reasonably implied as drafted.

In response, the Government argues that the jury saw sufficient evidence to conclude that the defendant possessed the Zastava firearm. Firstly, the Government claims that Hernández-Marín failed to challenge his constructive possession of the firearm. According to the First Circuit, "[c]onstructive possession of an object exists when a person knowingly has the power at a

particular time to exercise dominion and control over it." *United States v. Maldonado-García*, 446 F.3d 227, 231 (1st Cir. 2006). Secondly, regarding the knowledge of the nature of the gun, the Government argues that sufficient circumstantial evidence was presented to the jury as to said element. Docket No. 139 at 4. Not only did the jury see the modifications of the firearm but an expert witness testified that "a particular hole drilled in the lower receiver of the gun in and of itself had the gun a machine gun." *Id.* at 3. The expert further testified that the Zastava firearm was capable of firing multiple bullets with a single function of the trigger. *See id.*

Upon review, the Court deems that the Government presented sufficient evidence for a reasonable jury to conclude that in fact, Hernández-Marín had constructive possession of the firearm; he had purchased ammunition and loaded it into the firearm; which could result in also concluding he had fired a gun. Said conclusions are the result of the testimony of witnesses which were discussed in detail in pages 2 through 12.

For instance, the jury heard the testimony of Agent Cruz and the circumstances surrounding his intervention with the Defendant due to illegal tinted windows. As Agent Cruz was intervening with a Dodge RAM Pick-Up Truck and due to the heigh of the vehicle, in order to perform the photometer test to the windows, the doors of the Dodge RAM had to be opened. Hernández-Marín complied with the Agent's request and the firearm was found on the backseat of the pick-up truck. A reasonable jury can conclude that the intervention was legal and reasonable and that the incidental finding of the weapon was also legal. Photos and the actual weapons that were seized were presented as evidence in support thereof.

The jury also heard the testimony of Agent Lugo, who testified as to the weapons that were registered under Hernández-Marín's name and the compatible ammunitions that were purchased by the Defendant on January 17, 2019, merely one (1) month before his arrest. One of the firearms

occupied was an Aero Precision X15 pistol which was capable of using several calibers, including the 7.62 x 39 caliber ammunitions, same ammunitions that were purchased in January 2019 and were capable of being fired with the Zastava pistol. Then, Ms. Eisenbise testified that she tested the Zastava pistol with 7.62 x 39 caliber ammunition, the firearm was capable of firing more than one shoot at a time, and the firearm had been fired before her intervention. Therefore, the jury could have reasonably concluded that Hernández-Marín purchased ammunitions and fired the Zastava pistol prior to the intervention and occupation of the firearm.

Most critical and determinative, Mr. Diaz-Torres was called as a witness in order to introduce the digital evidence that was obtained from the Defendant's iPhone. Included therein were many internet searches of rifle parts, which added to the fact that the Defendant owned other weapons is sufficient for a reasonable jury to conclude that a person with Hernández-Marín's expertise in firearms certainly knew the capability of the Zastava in his possession. *See e.g.,* Government Exhibits 91, 92, 93, 96, 97, 100-106; *see also United States v. Giambro*, 544 F.3d 26, 30 (1st Cir. 2008)(holding that in a Rule 29 motion that the knowledge element was met as the defendant had a large number of guns in his possession which could lead to a reasonable inference that he was a gun collector or at least had a specialized knowledge and interest in firearms); *United States v. Morgan*, 216 F.3d 557, 568 (6th Cir. 2000)(holding that a reasonable jury could have found that the defendant's testimony as to not inspecting the weapon he acquired for a third selector switch or other automatic weapon identifiers lacked credibility as evidence was presented at trial in support of the fact that he was a gun enthusiast).

Therefore, viewing the evidence in the light most favorable to the prosecution, the Court finds that sufficient evidence was presented at trial to allow a rational trier of fact to find the

essential elements of the crime of possession of a machine gun beyond a reasonable doubt. Accordingly, the Defendant's motions for acquittal under Rule 29 and new trial must be **DENIED**.

## IV.    CONCLUSION

For the reasons stated above, the Court finds that the Government presented sufficient evidence whereupon a reasonable juror could find Defendant Gilberto J. Hernández-Marín guilty on the count charged. Accordingly, Defendant's *Renewed Motion for Judgment of Acquittal* (Docket No. 131) and *Motion for New Trial* (Docket No. 146) are hereby **DENIED**. Sentencing will proceed as scheduled.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of December, 2021.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge